Complainant, Jessop, the owner of a tract of land in Paterson bordering the Passaic river, uses the water of the river in his own business and the business of tenants upon his land. He complains that the defendant, Passaic valley water commission, unlawfully and to his injury, is diverting water from *Page 30 
the river at a point above his property and he prays that the commission be enjoined from continuing to interrupt the natural flow of the waters past his premises or else that it cause his water rights to be condemned.
The Passaic valley water commission was formed in 1927, under the provisions of P.L. 1923 p. 504; Cum. Supp. Comp. Stat. p.2308. Subsequently, on October 25th, 1930, the commission, by condemnation or purchase acquired the water supply system of the Passaic Consolidated Water Company. Among the properties acquired was an intake and pumping station at Little Falls on the Passaic above complainant's land. Defendant claims a prescriptive right to divert water at that point. Whether it has this right and, if so, the extent of the right, are the only issues in the case.
Some time before the case came to final hearing, the defendant moved that the suit be stayed until complainant should establish his right by a judgment at law. Complainant vigorously opposed the motion and it was denied. While courts of equity have concurrent jurisdiction with courts of law in cases of private nuisance, chancery will not, as a general rule, finally dispose of the case where the right is doubtful, since it is merely a jurisdiction in aid of a legal right. But defendant, by denying complainant's title in his answer, or by setting up a counter-right in himself, does not thereby oust this court of jurisdiction. The court will proceed and enforce complainant's right if it be clearly proved. Shields v. Arndt, 4 N.J. Eq. 234; Carlisle v. Cooper, 21 N.J. Eq. 576. Mr. Justice Dixon's well known classification of the cases in which equity may enforce legal rights in real estate, includes "cases where the legal right, though formally disputed, is yet clear on facts which are not denied and legal rules which are well settled."Leonard v. Hart, 42 N.J. Eq. 416. When the pleadings themselves disclose serious questions of fact or law, the court will stay the suit before the final hearing is reached. But in the present case, the bill shows a clear cause of action and the answer denies none of its allegations; instead it states that defendant and its predecessor in title without naming them) diverted large quantities of water from the river *Page 31 
for many years and so acquired a prescriptive right. The court, from a mere inspection of the pleadings, was unable to determine whether there were doubtful legal rights involved, and so denied the motion to stay the cause. But complainant, by resisting the motion and electing to proceed to hearing before obtaining a judgment at law, runs considerable risk. He cannot succeed unless the proofs be clear. Evidence which might justify a jury in finding in his favor, may not be sufficient in this court; doubtful issues must be resolved against complainant. Deluca v.Melin, 98 N.J. Eq. 367. I note that in Todd v. Staats,60 N.J. Eq. 507, it was held that when the case on final hearing is not clear, the proper course is not to dismiss the bill but to retain it until after a judgment at law is taken. That rule does not apply, I believe, where complainant has opposed staying the suit. George W. Helme Co. v. Outcalt, 42 N.J. Eq. 665.
Defendant's grantor, the Passaic Consolidated Water Company, was created in 1923 by a merger of the Acquackanonk Water Company, East Jersey Water Company, Kearny Water Company, Montclair Water Company and Passaic Water Company. The East Jersey Water Company had purchased from the Beattie Manufacturing Company, November 30th, 1901, the property at Little Falls where the pumping station and other water works are located, together with the right, as against the grantor, to draw from the river the quantity of water that the grantee should require to supply its customers, not exceeding a daily average of 50 M.G. (millions of gallons) and also all other rights of the grantor to use the water. By three deeds dated January 1st, 1908, the East Jersey Water Company conveyed undivided interests in the property, including the water rights, at Little Falls, namely, two-eighths to the Acquackanonk Water Company, one-eighth to the Montclair Water Company, three-eighths to the Passaic Water Company, and retained the remaining two-eighths itself. The East Jersey Water Company pumping station at Little Falls had been put in operation December 7th, 1899, perhaps under a lease, although its title at that time is not shown and is not important. This company and the other *Page 32 
three water companies to which it conveyed shares of the property, are referred to in the evidence as the "associated companies," although just what the relationship between them was, does not appear. At any rate, even before the deeds of January 1st, 1908, they all used water diverted at Little Falls. For instance, in 1908 the total daily average consumption was thirty-nine and nine-tenths millions of gallons, of which the East Jersey was charged with twenty-seven and three-tenths, the Acquackanonk with two and five-tenths and the Passaic with ten and one-tenth. After 1903, the Montclair company shared in the water. Taking the twenty-year period ending December 31st, 1923, the smallest daily average diversion in any one year was twenty-two and six-tenths millions of gallons in 1905, and the greatest, fifty and five-tenths millions of gallons in 1920.
On September 26th, 1924, Jessop began an action at law in the New Jersey supreme court against the East Jersey, the Acquackanonk and the Montclair companies for damages caused him by the defendant companies in diverting water "to wit, forty millions of gallons of water each day" during the six years last past. The suit was settled and on November 2d 1925, discontinued. As a part of the settlement, Jessop, by indenture dated October 17th, 1925, granted the Passaic Water Company the right as against him to withdraw and divert "such amounts of water not to exceed an average of sixty millions of gallons a day necessary for the present or future business or use of the party of the second part, its successors or assigns, for and during the full period from the date hereof, to and including October 6th, 1929." During the period covered by this grant, the amount of water used by the Consolidated Water Company rose to a daily average of fifty-eight and three-tenths millions of gallons in 1928. After the water commission took over the property the amount dropped in 1931 to thirty-nine and eight-tenths millions of gallons and in the first six months of 1932 to thirty-three and nine-tenths millions of gallons. On July 4th, 1932, the commission started to use Wanaque water and continued the use of the Little Falls station only for industrial purposes. In *Page 33 
the last six months of 1932, it drew from the latter source an average of fourteen and five-tenths millions of gallons, and during the first five months of 1933, eighteen and one-tenth millions of gallons.
The defendant relies on the rule that the enjoyment of an incorporeal hereditament, exclusive and uninterrupted for twenty years, creates a conclusive presumption of a grant, and confers an indefeasible right. Campbell v. Smith, 8 N.J. Law 140;Horner v. Stillwell, 35 N.J. Law 307; Lehigh Valley RailroadCo. v. McFarlan, 43 N.J. Law 605. Complainant, while admitting this general rule, raises several points as to its application to the present case: (1) That an easement in gross to divert water could not be acquired by any of the companies. Weidman SilkDyeing Co. v. East Jersey Water Co., 91 Atl. Rep. 338. This point is well taken. There is no proof that the companies had franchises which might support such an easement. (2) That none of the companies, save the East Jersey, owned any land which could stand as the dominant tenement before January 1st, 1908, and hence proof of the abstraction of water by them prior to that date does not support defendant's prescriptive title. This will be considered below. (3) That neither the period covered by the pendency of the suit in the supreme court, nor that covered by the grant of October 17th, 1925 (DeLuca v. Melin,103 N.J. Law 140; Soper v. Conly, 108 N.J. Eq. 370), can be counted as part of the prescriptive period. This is sound as to the period covered by the grant. Whether the pendency of the law action stopped the clock is most doubtful (2 C.J. 109) and need not be decided. (4) That the acceptance of Jessop's grant by defendant's predecessor in title is evidence that defendant had no prescriptive right.
Since defendant is not claiming under the grant, it is not estopped by its predecessor's acceptance thereof from proving independent paramount title by prescription. Den, ex dem.Osborne v. Tunis, 25 N.J. Law 633, 655. The acceptance of the deed by the consolidated company did not divest its title already acquired. Yet it is competent evidence as to the character of the company's prior acts which are claimed to *Page 34 
constitute an adverse user. Lewis v. Bolte, 86 N.J. Law 413.
Jessop's indenture gave the right to withdraw as much as sixty millions of gallons and is very slight evidence that the company's prior diversion of smaller amounts of water was not adverse to Jessop or that the company did not claim the right to take, say, forty millions of gallons.
I go back to the second point raised by complainant as stated above. From 1901 to 1907 the Acquackanonk, the Passaic and the Montclair companies owned no interest in the land at Little Falls where the water was drawn from the river and therefore could not acquire a water easement in Jessop's property. The real estate belonged to the East Jersey. There seem to have been two intakes, one operated by a low pressure pump with a forty-two-inch meter, and the other a high pressure line through a fifty-one-inch meter. The water for the different companies was either measured by meters or estimated on a percentage basis. The East Jersey company did the actual pumping and filtering and so on, until 1908, that is, while it was sole owner of the land; thereafter the Montclair company, until the merger of 1923. Mr. Cook, for many years an officer of the Consolidated company and its predecessors in his testimony spoke of the East Jersey as the "agent" which managed the affairs for the benefit of all the companies. Asked whether the other companies purchased their water from the East Jersey, he replied, "not just like that," and mentioned some agreement between the companies. The evidence, while not entirely clear, is enough to show that the diversion up to 1908 was made by the East Jersey company, the owner of the land, and so the whole amount withdrawn can be considered in order to ascertain the extent of the defendant's prescriptive right.
The defendant says that its predecessors from 1901 to 1925 withdrew as much water as they needed to supply the municipalities who were their customers, and therefore the defendant has a prescriptive right to divert as much water as may be necessary to supply its customers. S.O. C. Co. v. AnsoniaWater Co., 83 Conn. 611; 78 Atl. Rep. 432. I do not think this the law of New Jersey. Holsman v. Boiling Spring Bleaching *Page 35 Co., 14 N.J. Eq. 335, a suit to restrain pollution, holds that the extent of the prescriptive right acquired is to be measured by the extent of the enjoyment upon which the right is founded. "Discharging one hundred gallons of dye stuffs weekly cannot establish the right of discharging into the stream in the same period of time over three thousand four hundred pounds of chemicals, starch, vegetable oils and fibre." In Carlisle v.Cooper, 19 N.J. Eq. 256; 21 N.J. Eq. 576, it was held that the extent of the right to flow the lands of another acquired by adverse user is not determined by the height of the dam but by the actual enjoyment of the easement as evidenced by the extent to which the land was habitually or usually flowed during the period of prescription. But the extent of the right so acquired does not depend on fluctuations due to accidental causes such as a want of repairs or variation in the quantity of water in time of drought. In Exton v. Glen Gardner Water Co., 3 N.J. Mis. R.613; 129 Atl. Rep. 255, Vice-Chancellor Buchanan found evidence of adverse user for twenty years "of enough to supply forty customers at ninety gallons each per day, or three thousand six hundred gallons per day," and enjoined diversion above that amount.
A riparian owner who takes through a number of years a quantity of water sufficient to give a cause of action to a lower owner, and yet not enough to spur him to prosecute his action, does not thereby acquire a right to draw a greater quantity, to the greater damage of the lower owner. The right so acquired is measured by the burden cast upon the servient tenement; it is determined by the amount habitually withdrawn and not by the purpose for which the dominant owner diverts the water. In the present instance, the proofs show an uninterrupted adverse user of the waters of the Passaic at Little Falls by defendant and its predecessors in title from 1901 to 1925, a period of more than twenty years. The amount diverted has varied from day to day and the daily average has varied from year to year. From 1905 to the end of the period there was, in general, an increase in the amount taken. From 1905 to 1908 the yearly averages were twenty-two *Page 36 
and six-tenths, twenty-two and eight-tenths, twenty-four and four-tenths, twenty-three and eight-tenths. Defendant has shown a prescriptive right to a daily average of twenty-two and six-tenths millions of gallons but no more. The year the bill was filed, 1931, defendant extracted thirty-nine and eight-tenths millions of gallons. Complainant is entitled to an injunction against a diversion in excess of the amount to which defendant has acquired title, unless defendant chooses to acquire the additional right as against complainant by condemnation or purchase. *Page 37